Scott Michael Hare, Esquire
Special Counsel to Blue Dog at 399 Inc.
437 Grant Street – Suite 1806
Pittsburgh, PA 15219
(412) 338-8632
scott@scottlawpgh.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------x

In re                                                                  Chapter 11

BLUE DOG AT 399 INC.,                                Case No. 15-10694-mew

                                Debtor.
-----------------------------------------------------x
BLUE DOG AT 399 INC.,

                                Plaintiff,                 Adv. Pro. No. 19-_____

            -against-

SEYFARTH SHAW, LLP and
RALPH BERMAN,

                                Defendants.
-----------------------------------------------------x

## ADVERSARY COMPLAINT

Plaintiff Blue Dog at 399 Inc. ("**Blue Dog**" or the "**Debtor**") files this Adversary

Complaint against its former counsel, Defendants Seyfarth Shaw, LLP ("**Seyfarth**") and Ralph

Berman, Esquire ("**Berman**"), and alleges the following good cause for the relief requested herein:

## INTRODUCTION

1.      On March 24, 2015, the Debtor commenced a voluntary case under chapter 11 of the Bankruptcy Code.

2.      The Debtor brings this action seeking damages for negligence (legal malpractice) against its former special litigation counsel, Seyfarth Shaw, LLP and the individual lawyer who represented it, Ralph Berman, in an adversary proceeding (now settled) entitled *Blue Dog at 399 Inc. v. BP 399 Park Avenue LLC, Adv. No. 15-01097-mew* (the "**Landlord Action**").

## JURISDICTION AND VENUE

3.      Debtor brings this adversary proceeding pursuant to Rule 7001(1) of the Federal Rules of Bankruptcy Procedure.

4.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334.

5.      Venue lies in this Court pursuant to 28 U.S.C. § 1409(a).

6.      Subject-matter jurisdiction, personal jurisdiction and venue are further proper pursuant to this Court's Order dated July 5, 2017 [Docket No. 109 at Bankr. No. 15-10694 and Docket No. 76 at Adv. No. 15-01097], in which this Court expressly retained jurisdiction "over any and all disputes arising out of or relating to this Order or to Seyfarth's retention by the Debtor."

7.      Subject-matter jurisdiction, personal jurisdiction and venue are further proper pursuant to this Court's Order dated December 6, 2018 [Docket No. 24 at Adv. No. 18-01571], in which this Court expressly determined "that any future action that may be filed with respect to claims for negligence/legal malpractice arising out of the same facts and circumstances alleged in Count Two of the Complaint may be commenced exclusively in this Court."

8.      The Debtor consents to the entry of final orders or judgment by the Bankruptcy Court.

## PARTIES

9.      The Plaintiff is a New York corporation and is the Debtor herein.

10.      Defendant Seyfarth Shaw, LLP is a New York limited liability partnership with a principal place of business located at 620 Eighth Avenue, New York, NY 10018-1405.

11.      Defendant Ralph Berman is an attorney licensed to practice law before this Court and in the State of New York. Berman was employed as an attorney with the Seyfarth firm during the events described herein.

## FACTS

### A.      Background and Underlying Adversary Proceeding

12.      Blue Dog was a tenant in a building at 399 Park Avenue, New York, NY, pursuant to a lease with BP 399 Park Avenue LLC (the "**Landlord**") dated January 1, 2012 (the "**Lease**").

13.      Sometime after execution of the Lease, a dispute arose between Blue Dog and the Landlord regarding various Lease terms, as a result of which the Landlord declared that Blue Dog was in default of the Lease and purported to cancel and terminate the Lease. Blue Dog denied that it was in material breach, denied that it failed to cure any alleged breach, and denied that the Landlord was entitled to declare a default or cancel and terminate the Lease. (Blue Dog's position was later validated in Debtor's eventual settlement with the Landlord as described below.)

14.      In light of the parties' dispute, Blue Dog filed a Verified Complaint against Landlord on September 11, 2012 in the Supreme Court of the State of New York at Case Index No. 653158-2012 (the "State Court Action").

15.      By letter dated February 25, 2015, Matthew K. Bendix, P.E., an expert consultant to Blue Dog, provided an opinion regarding the professed concerns alleged by the Landlord as a barrier to opening.

16.     By letter dated March 2, 2015, Bendix further opined regarding the professed concerns alleged by the Landlord.

17.     Blue Dog promptly filed the Bendix expert reports in the State Court Action on March 3, 2015, with service on the Landlord. (As recited below, despite the relevance and benefit of the Bendix reports, Seyfarth later inexplicably neglected to employ those expert reports in the subsequent Landlord Action in this Court.)

18.     Shortly thereafter, beginning on or around March 20, 2015, Blue Dog consulted with counsel, including Seyfarth, regarding a possible bankruptcy filing. As set forth in great detail below, Seyfarth immediately became and remained actively and intimately involved in the bankruptcy case and, more significantly, the Landlord Action from the outset of both, although its participation was not disclosed to this Court until more than one year later.

19.     While the state-court proceedings remained pending, the Debtor, through John Giampolo, Debtor's bankruptcy counsel of record, filed this Bankruptcy on March 24, 2015.

20.     By email dated March 30, 2015 to Debtor and Seyfarth attorneys Adrian Zuckerman and Jonathan Wolfert, Debtor's bankruptcy counsel confirmed a game plan designed by Seyfarth for pursuit in the Bankruptcy Court, memorializing in relevant part:

> Subject to any further input from Paul or Adrian [Zuckerman of Seyfarth], the following is what Jonathan [Wolfert of Seyfarth] and I discussed earlier. I'm going to draft a letter to the Landlord in response to its letter from Friday evening briefly stating:
>
> * * *
>
> b.      The Debtor intends to file a complaint commencing an adversary proceeding in its Chapter 11 case against the Landlord for breach of the stipulation and the lease and seeking an adjudication that, as of the date the bankruptcy was filed, the lease (and any rights to possession of the premises) was not validly terminated.—*Jonathan and Adrian will provide just one or a few sentences describing this argument/basis for me to insert into the letter and their firm will be handling drafting and prosecuting this complaint going forward*.

c.      Accordingly, the Landlord is on notice that the Debtor's leasehold and rights to possession of the premises, as well as property located on the Premises, are all property of the Debtor's estate, which will be affirmed when the Bankruptcy Court grants the foregoing relief we seek. Unless and until the Bankruptcy Court rules otherwise, the automatic stay prohibits the Landlord from taking any actions with respect to such estate property and the Landlord risks sanctions and other redress if it takes any such actions without an order of the Bankruptcy Court.

* * *

Also, attached is my draft application, affidavit and proposed order to authorize the Debtor's retention of our firm as counsel for the Debtor in this Ch. 11 case, along with my draft application, affidavit and proposed order to authorize retention of Seyfarth Shaw as special litigation counsel to represent the Debtor in connection with **seeking adjudication of the Debtor's interest in the lease and the premises, prosecuting affirmative claims against the Landlord, and other related disputes between the Debtor and the Landlord** which the Debtor anticipates litigating in this Ch. 11 case. Please review and provide any comments. Adrian and Jonathan, please confirm the accuracy or provide any missing information in your retention papers.

(Italics and bold emphasis in the original.)

21.     By letter dated April 9, 2015, before the filing of the Landlord Action, Seyfarth agreed to represent Debtor's principal "individually in connection with the bankruptcy of Blue Dog at 399 Inc." Contrary to the scope of the engagement as described just ten days earlier in the March 30, 2015 email, Seyfarth emphasized that the firm's "engagement is limited to performance of services related to this matter. We will provide you individually with advice and counseling. We will not appear for you (or Blue Dog at 399 Inc.) in the bankruptcy proceeding or in any other action."

22.     Despite this professed limitation to the scope of its engagement, Seyfarth quickly assumed *de facto* control over the Landlord Action, as detailed below, although its *de facto* control over the Landlord Action remained undisclosed to this Court for more than one year thereafter.

23.     On April 17, 2015, as a result of the ongoing and unresolved landlord-tenant dispute, Blue Dog commenced the Landlord Action, asserting claims for declaratory judgment,

wrongful eviction, breach of lease and breach of the implied covenant of good faith and fair dealing,

and seeking damages, treble damages pursuant to Section 853 of the New York Real Property and

Proceedings Law, and injunctive relief.

24.    By email dated May 18, 2015, Debtor's bankruptcy counsel advised Seyfarth

attorneys Zuckerman and Wolfert regarding discovery procedures in adversary proceedings:

> Below are my thoughts on best to proceed given the applicable Federal Rules of Bankruptcy Procedure ("FRBP") and Local Rules of this Bankruptcy Court.
>
> The FRBP generally incorporate and apply the Federal Rules of Civil Procedure ("FRCP") to adversary proceedings, including FRCP Rule 26 incorporated by FRBP Rule 7026. Rule 26(d) provides that a party may not seek discovery from any source before the parties have conferred as required by Rule 26(f), which provides that the parties shall confer as soon as practicable to consider settlement possibilities and develop a proposed discovery plan. . . .
>
> Since we would need to confer with Landlord's counsel pursuant to Rule 26(f) before we can properly serve discovery demands and since the parties are required to have their Rule 26(f) conference as soon as practicable and to discuss settlement during it, my thoughts are to inform Landlord's counsel that we will consent to their requested 30 day extension of time to respond to the complaint but we want to have the requested settlement conference call (among lawyers and clients) no later than this week and, for everyone's efficiency, we want that conference to also serve as our required Rule 26(f) conference. If the Landlord engages in such Rule 26(f)/settlement conference with us by end of this week then during that conference ***we propose a discovery plan that is as expedited and streamlined as Adrian and Jonathan want it to be***.

(Emphasis added.)

25.    By email dated May 21, 2015, Debtor's bankruptcy counsel transmitted

correspondence regarding scheduling from Landlord's counsel to Seyfarth attorneys Zuckerman

and Wolfert, reminding them to provide their instructions regarding the discovery schedule in the

Landlord Action:

> ***Please email me your preferred/proposed Rule 26 discovery plan with all expedited discovery timelines that you want***. When Schmidt calls me tomorrow that will constitute our Rule 26f conference and ***I'll tell him the discovery plan you want***. If he won't arrange a settlement call among lawyers and clients this week, then at least I will have satisfied the required Rule 26f

conference and *you can then serve whatever discovery demands you want and we can then submit your expedited discovery plan to the Bankruptcy Judge* asking for a conference to grant it and to address settlement.

(Emphasis added.)

26.     By email dated May 22, 2015, Debtor's bankruptcy counsel reminded Seyfarth attorneys Zuckerman and Wolfert to provide their instructions regarding the discovery schedule in the Landlord Action: "Just a reminder, Schmidt is going to call me sometime after 1pm today. I'll need to know what expedited discovery timelines you want in order for me to have a Rule 26f conference with him about it."

27.     After attending the Rule 26(f) conference, Debtor's bankruptcy counsel sent a follow-up email dated May 22, 2015 to Seyfarth attorneys Berman, Zuckerman and Wolfert to report and to request their further instructions regarding the discovery schedule in the Landlord Action:

> I had my Rule 26f conference with Schmidt this afternoon. . . .
>
> Regarding an expedited discovery plan, *you said you wanted all written discovery responses due late June, streamlined scope for discovery demands, complete fact witness depositions and notice any experts in mid July with any expert reports or depositions to be completed sometime in August*. Schmidt said BP may agree to that but *he wants to see your draft proposed discovery plan*, including seeing exactly how you propose to streamline/limit the subjects of discovery so that it would be feasible to respond to all discovery demands so quickly. But even if he agrees to your expedited discovery plan, he still has to immediately proceed with a motion to dismiss the adversary complaint and will take the position that it can be disposed at the pleading stage and we don't need discovery but if Judge Wiles doesn't dismiss the complaint in its entirety on a motion to dismiss, BP would likely want to proceed with expedited discovery in order to seek dismissal on summary judgment as soon as possible.
>
> *My thoughts are, whenever you would like, send us your written discovery demands to be served on BP on behalf of the Debtor, as well as your Rule 26 draft proposed discovery plan to be forwarded to Schmidt* and if he won't agree to it, we submit your discovery plan to Judge Wiles asking for a conference (telephonic or in person) to address granting the discovery plan we want and perhaps asking Judge Wiles to compel BP's participation in a

settlement conference—although I think that may not be fruitful and BP will not consider resolving this at least not until after BP is unsuccessful with a motion to dismiss.

(Emphasis added.)

28.    By follow-up email dated June 18, 2015, Debtor's bankruptcy counsel reminded Seyfarth attorneys Berman, Zuckerman and Wolfert to provide their proposed discovery schedule in the Landlord Action:

> We had discussed below that ***you wanted to provide me with a proposed Rule 26 discovery plan for the expedited discovery you want in this adversary proceeding so I could send that to Schmidt,*** ask him to agree it and submit to Judge Wiles asking to grant it or conference it and at the least it may bolster our position that discovery of disputed facts is necessary and will expeditiously proceed so this adversary proceeding should not be dismissed on the pleadings. ***I don't believe I ever received your proposed Rule 26 discovery plan*** and Schmidt said he is filing his motion to dismiss tomorrow.

(Emphasis added.)

29.    By follow-up email dated June 19, 2015, after the Landlord filed its Motion to Dismiss, Debtor's bankruptcy counsel again reminded Seyfarth attorneys Berman, Zuckerman and Wolfert "Finally, please forward your proposed Rule 26 discovery plan for the expedited discovery you want in this adversary proceeding if you still want to proceed with that."

30.    By follow-up email dated June 30, 2015, Debtor's bankruptcy counsel reminded Seyfarth attorneys Berman, Zuckerman and Wolfert to provide their proposed discovery schedule in the Landlord Action:

> Recall tomorrow morning is the next case management conference regarding administration of the Debtor's bankruptcy as well as the pre-trial conference for Debtor's adversary proceeding against BP. ***I have not received your proposed Rule 26 discovery plan for the expedited discovery you want in this adversary proceeding. Please forward it to me if you still want to proceed with that***.

(Emphasis added.)

31.    By follow-up email dated July 9, 2015, Debtor's bankruptcy counsel again reminded Seyfarth attorneys Berman, Zuckerman and Wolfert to provide their proposed discovery schedule: "Elizabeth [Slavutsky, Debtor's principal] had asked if your office will still be providing a proposed Rule 26 discovery plan seeking the expedited discovery you want or if you now prefer to wait until after mediation or the Motion to Dismiss to do so."

32.    By follow-up email dated November 10, 2015, after the Court denied Landlord's Motion to Dismiss, Debtor's bankruptcy counsel again reminded Seyfarth attorneys Berman, Zuckerman, Wolfert and Edward Fox to provide their proposed discovery schedule: "I still suggest putting together your preferred/proposed Rule 26 discovery plan for the reasons I mentioned earlier today." By reply email minutes later, Berman assured Debtor's bankruptcy counsel "We're working on that. Will circulate tomorrow."

33.    By email dated January 8, 2016, Debtor's bankruptcy counsel transmitted correspondence from Landlord's counsel to Seyfarth attorneys Berman, Zuckerman, Wolfert and Fox, asking them to comment regarding Landlord's requested revisions to Seyfarth's draft pretrial scheduling order.

34.    On February 1, 2016, this Court entered the parties' proposed Joint Pretrial Scheduling Order [Docket No. 19 in the Landlord Action] directing, *inter alia*, that "All affirmative expert reports shall be delivered by April 21, 2016, with depositions of those experts to be taken and completed by May 5, 2016," and that "All responding expert reports shall be delivered by May 12, 2016, with depositions of those experts to be taken and completed by May 26, 2016." The Joint Pretrial Scheduling Order further required discovery to be completed no later than May 26, 2016, unless "extended by order of the Court for cause shown."

35.    By email dated February 10, 2016, Debtor's bankruptcy counsel reminded Seyfarth attorneys Berman, Zuckerman and Wolfert that it was necessary for them to provide their

-9-

discovery requests for service by the following day, and further reminding them of the open matter surrounding their retention:

> Just another reminder that all written discovery requests (requests for production of documents, interrogatories and requests to admit) are due to be served tomorrow. Please provide drafts as soon as you can and please forward your updated/revised Seyfarth retention application when you can.

36.    By reply email dated February 11, 2016, the final day on which discovery could be timely served, Berman circulated draft discovery requests to fellow Seyfarth attorneys Zuckerman, Wolfert and Fox and to Debtor's bankruptcy counsel for review.

37.    By email dated February 18, 2016 to Debtor with copies to Seyfarth attorneys Zuckerman, Wolfert and Fox, Berman advised Debtor regarding a proposed liability expert witness he had contacted:

> Elizabeth: Joe Wallwork, who is a consultant we are talking to about testifying concerning your readiness to open on Feb. 28 has reviewed the documents that Sperber has and looked over the other sides discovery. He'd like to have a conference call on Friday to go over things and discuss where he is and what he needs. When can you be available tomorrow to have a conference call? I don't think it will take this long, but it would be a good idea to have a half hour to an hour free.

38.    By reply email sent the same day, Debtor supplied Seyfarth with a copy of the February 25, 2015 expert report prepared by Matthew K. Bendix, P.E., which Seyfarth failed to use.

39.    By email dated March 2, 2016, Seyfarth attorney Zuckerman contacted Debtor's principal to remind her of upcoming deadlines in the Landlord Action, advising:

> ***Please be cognizant of the discovery timetables, there is not much time***. We will answer any questions you may have regarding any deadlines that are coming up that you or other counsel may have.

(Emphasis added.)

40.    By letter dated March 3, 2016, Seyfarth attorney Zuckerman again contacted Debtor's principal to reiterate the importance of upcoming deadlines in the Landlord Action, including deadlines governing expert disclosures:

> As you know, Blue Dog's adversary proceeding against BP 399 Park Avenue LLC ("Landlord") **_has reached a critical phase, and there is much work to be done in a fairly short time_**. Under the Scheduling Order approved by the Court, Blue Dog served its responses to document demands and requests to admit today. Blue Dog will also be receiving responses to the discovery demands it made to Landlord in February. The responses and documents received from Landlord will have to be reviewed as soon as possible to meet the remaining deadlines set by the Court.
>
> Depositions of all fact witnesses must be completed by April 8, 2016. **_Expert reports are due by April 21 and the experts must be deposed by May 5. Expert rebuttal reports are due on May 12, with deposition of rebuttal experts to be completed by May 26, 2012_**. Consequently, the discovery material being exchanged now, and any subpoenas to third parties to get additional material, which you have already discussed with Ralph, will have to be received and reviewed in time to commence depositions in the next week or two, and in order to have expert reports ready shortly thereafter.
>
> In addition, in order to represent you and Blue Dog most effectively, **_we must submit to the Court a motion to be retained as special litigation counsel by Blue Dog, as well as seek approval of the retention of Joe Wallwork and his team_**. . . .

(Emphasis added.)

41.    Despite the fact that Blue Dog **_already had a written expert report_** from Matthew K. Bendix, P.E. (which Seyfarth failed to employ for any purpose), Seyfarth arranged for its new proposed expert to inspect the premises on March 25, 2016, prior to the deadline to produce expert reports. After his site visit, the new proposed expert advised Berman and Seyfarth as follows:

> Today we inspected the Blue Dog restaurant located in 399 Park Ave. Our observations are as follows:
>
> In general the workmanship and quality of the work is very good.

The construction work is complete with the exception of a few very minor items. There are a few ceiling tiles that need to be reset in their proper location. They appear to have been moved for access to few equipment items located above the ceiling. This is quite literally a few minutes of work. The data cables leading to the order printers in the kitchen area also need to be routed to their final location and protected. Again a few minutes of work.

There are no Blue Dog signs or menu's etc. posted. This is not an item that would prevent opening but would only take a few hours to post. This would be a part of the final preparations for opening.

The Plumbing work appears to be complete.

The Kitchen equipment installation appears complete. All equipment seems to be connected and ready for service.

The electrical service and installation appears to be complete and ready for full operation.

The HVAC system appears complete. We did not operate any units but all appeared to be properly installed and connected. In conversation with Elizabeth we were able to determine that the missing relay from the fan shut down circuit discovered at the time of the test was included in the original design and was installed. The relay simply "plugs in". It seems that somehow, for some reason, that relay was removed at some time after installation but prior to the test.

The fire alarm system in the Blue dog space appeared fully operational. However, there was a trouble indication on the panel. We were allowed to look at the main building fire alarm panel. There was no indication of trouble relating to Blue Dog. There was a trouble indicator for another floor but the person on duty in the Fire Command Center told us that a portion of the system was turned off because of ongoing construction work. He went on to explain that there is no problem with the Blue Dog panel. The Blue Dog trouble alarm is because there is no connection to an outside central station alarm monitor (Elizabeth did have an agreement in place for central station monitoring but the building terminated that arrangement after the eviction). He explained that the Blue Dog panel reports to the Main Panel and that the building is monitoring the space. He further stated that the Blue Dog system is operating and in use and all they need to do is have the fire marshal come in an inspect the system for final approval.

Based on what we saw, the Blue Dog restaurant appeared to be ready to open. The Fire alarm system was functioning and is in use today by the building monitoring the space. The few minor issues (reset ceiling tiles) are aesthetic, would not prevent an opening, and could be remedied in minutes. All that remains is a final cleaning and delivery and set-up of the food and supplies.

Joseph W. Wallwork, PE, CCP, PSP, CFCC, FAACE

Managing Director
Nautilus Consulting, LLC

42.    Three days later, by email dated March 25, 2016, Berman transmitted the
Wallwork correspondence to Seyfarth attorneys Zuckerman, Wolfert and Fox (though not to
Debtor's bankruptcy counsel), with a copy to Debtor, raving "I think it is all good news."

43.    Seyfarth attorney Zuckerman promptly responded twice that same day by separate
emails agreeing "Great news - good report!" and "FYI - good report!"

44.    Despite the "good news," "great news" and "good report" delivered by Wallwork,
Seyfarth failed to deliver any such report or other expert disclosure to the Landlord in compliance
with the deadline governing expert disclosures.

45.    By agreement of the parties, the Court issued an Amended Joint Pretrial Scheduling
Order dated April 8, 2016 [Docket No. 20 in the Landlord Action], amending the original
scheduling order to require that "All affirmative expert reports shall be delivered by May 19, 2016,
with depositions of those experts to be taken and completed by June 2, 2016," and that "All
responding expert reports shall be delivered by June 9, 2016, with depositions of those experts to
be taken and completed by June 23, 2016." As before, the Amended Joint Pretrial Scheduling
Order required discovery to be completed by the stated deadline (June 23, 2016) unless "extended
by order of the Court for cause shown."

46.    Shortly thereafter, by email dated April 14, 2016 to Debtor with copies to Seyfarth
attorneys Wolfert and Berman (though not to Debtor's bankruptcy counsel), Zuckerman reminded
Debtor of the upcoming adjusted deadlines, including most importantly deadlines regarding expert
disclosures:

Blue Dog Adversary Proceeding Schedule

May 6, 2016 -- Depositions of all fact witnesses to be completed. ($25,000)
***May 19, 2016 -- Affirmative expert reports***. ($15,000)

> *June 2, 2016 -- Depositions of those experts to be completed*. ($15,000)
> *June 9, 2016 -- All responding expert reports*. ($15,000)
> *June 23, 2016 -- Depositions of responding experts to be completed*.
> ($15,000). All discovery closed.
> July 21, 2016 -- submission of Joint Final Pretrial Order. ($25,000) Any motions in
> limine shall be filed on or before the Final Pretrial Order Date. Proposed findings
> of fact and conclusions of law should be submitted on or before the Final Pretrial
> Order Date.
> [To be scheduled] -- Trial (estimated at 1-2 days). ($25,000)
> [Undated] -- Motion to retain Seyfarth as Special Counsel. ($5,000)

(Emphasis added.)

47.     By email dated April 21, 2016 to Debtor with copies to Seyfarth attorneys Wolfert

and Berman (though not to Debtor's bankruptcy counsel), Zuckerman again reminded Debtor of

the upcoming deadlines, reiterating "***As you know you have some specific deadlines***

***coming up. Please do not ignore them***. If you need information about the deadlines or what

has to be done by the deadlines please call us so we can tell you what needs to be done by when."

(Emphasis added.)

### B.    <u>Seyfarth Appears and Promptly Impairs the Landlord Action</u>

48.     As set forth above, Seyfarth controlled the contours, claims, strategy and

management of the Landlord Action from its conception in March 2015, even before Debtor filed

that adversary proceeding.

49.     After covertly directing the Landlord Action for the prior year, on April 28, 2016 -

just one week before the deadline for depositions of fact witnesses, and just three weeks before the

deadline for production of expert reports - Berman contacted Debtor's bankruptcy counsel by

email, with copies to Seyfarth attorneys Zuckerman and Wolfert, to move forward with the firm's

retention application.

50.     On May 18, 2016 Debtor's bankruptcy counsel filed an Application of the Debtor

for Entry of an Order Authorizing Employment and Compensation of Seyfarth Shaw, LLP as

Special Litigation Counsel for the Debtor and Debtor-in-Possession *Nunc Pro Tunc* to the Application Date Pursuant to Bankruptcy Code Sections 327(e) and 328 and Rule 2014 of the Federal Rules of Bankruptcy Procedure [Docket No. 60 in the Debtor's lead case].

51.    In support of the Seyfarth retention application, Seyfarth attached an engagement letter addressed to Blue Dog [Docket No. 60-2 in the Debtor's lead case]. The Seyfarth engagement letter expressly provided, *inter alia*, that the firm's client is Blue Dog, that the firm agrees to represent Blue Dog as special litigation counsel in the Adversary Proceeding filed at Adv. No. 15-1097 (to-wit, the Landlord Action), that Blue Dog would be "represented principally" in the adversary by, among others, Mr. Berman, and that Seyfarth would be paid for its efforts (at rates hovering near and above $1,000 per hour) exclusively by a principal of Blue Dog, and not by Blue Dog itself.

52.    Pursuant to the Amended Joint Pretrial Scheduling Order dated April 8, 2016 that Seyfarth helped to draft, affirmative expert reports were due the following day, May 19, 2016, as Seyfarth repeatedly acknowledged above. Seyfarth did not seek any extension to this deadline. Instead, despite the many reminders and discussions detailed above, Seyfarth completely neglected this deadline, neglected to serve any expert reports, and thereby directly and irreparably impaired the prosecution, potential resolution, and potential recovery in the Landlord Action.

53.    Pursuant to the same Amended Joint Pretrial Scheduling Order, the deadline for expert depositions was June 2, 2016, as Seyfarth repeatedly acknowledged. Seyfarth did not seek any extension to this deadline either, but instead ignored this deadline as well and neglected to schedule any expert depositions.

54.    This Court approved the Seyfarth retention application by order dated June 13, 2016 [Docket No. 67 in the Debtor's lead case].

55.    By letter dated July 15, 2016 [Docket No. 22 in the Landlord Action], Seyfarth asked this Court to schedule a telephone conference at its earliest convenience "to address the refusal" of the Landlord "to abide by its commitments and produce necessary discovery." Seyfarth specifically objected to the Landlord's "refusal to produce witnesses, its non-cooperation and other delay tactics," which reportedly precluded Blue Dog from completing the depositions of fact witnesses. As a result of these discovery delays, Seyfarth requested that the Court extend the deadline for discovery and pretrial submissions. In passing, Seyfarth also requested "a short additional time for expert discovery," without admitting in candor to the Court or its client that it already missed the deadline to serve expert reports two months earlier.

56.    As requested in the July 15, 2016 letter, the Court held a telephonic hearing on the discovery dispute on July 19, 2016. *See* Hearing Transcript [Docket No. 28 in the Landlord Action]. During the hearing, Berman requested "an extra couple of weeks to try to get these [depositions] done so that we can do our expert reports and get this thing ready for trial." Hearing Transcript, p.5, lines 10-12. In response, counsel for the Landlord argued, *inter alia*, that the discovery deadline had already closed, that weeks had passed by during which he heard nothing from Berman, and that in his view, the burden fell upon Seyfarth to move the Court to extend (*i.e.*, reopen) discovery, which he would not oppose. *See generally* Hearing Transcript, pp. 6-8.

57.    At Berman's and Seyfarth's request, the Court extended the lapsed deadline to complete discovery until August 10, extended the deadline for pretrial submissions to August 18, and unambiguously cautioned the parties "I won't make any other changes to the schedule. We will have our final pretrial on the 18th and we will then set a trial date. Okay?" Hearing Transcript, p.8. In response, Berman again raised the issue of expert reports, requesting "once we do finish with fact witnesses, there was a period of time for the exchanging of expert reports and expert depositions. I thought we could still accommodate that. ***That's a fairly important part of our***

-16-

*case* [emphasis added]." Hearing Transcript, p.9, lines 1-5. This Court summarily rejected Berman's proffered rationale as "utter nonsense," admonishing that "***There's no reason why you can't get your experts done within the normal discovery schedule or why they have to wait until the fact witnesses are done. So you should have been working on that already*** [emphasis added]." Hearing Transcript, p.9, lines 11-14. Nonetheless, this Court granted the requested relief and extended expert discovery to August 10, warning once again "I'm not going to extend it any further." Hearing Transcript, p.9, lines 15-16. Berman acknowledged there would be no further extensions, agreeing "Very good, Your Honor." Hearing Transcript, p.9, line 17.

58.     By email dated August 8, 2016, Seyfarth attorney Zuckerman contacted Debtor to request further payment for the firm's proposed (though still-undisclosed) expert, emphasizing the importance of the contemplated expert testimony and alluding to the likelihood of an upcoming summary judgment motion: "***We are more likely than not going to need an affidavit from him to oppose any motion the landlord may make to pare down the claims and then need his testimony for the hearing***." (Emphasis added.)

59.     Despite the fact that Seyfarth allowed discovery to close once already without attending to its expert reports, despite its finger-wagging rebuke of the Landlord's counsel for perceived "delay tactics" and a refusal to "abide by its commitments," despite its admission that expert reports are "a fairly important part of our case," and despite the Court's repeated admonition that such reports and depositions would be due by August 10, *with no further extensions*, ***Seyfarth once again let the deadline pass without serving a single expert report***.

60.     Even more remarkably, despite the long-gone original deadline for expert reports, and despite the passage of the latest and final August 10 deadline, Seyfarth waited until August 11, 2016 before it even tried to locate a damages expert.

61.   Specifically, by email dated August 11, 2016 (with copies to Seyfarth attorneys Zuckerman and Wolfert), Berman contacted a potential damages expert, Gary Levy, CPA, the Hospitality Industry Practice Leader of CohnReznick LLP, 1301 Avenue of the Americas, New York, NY 10036, to prepare a report opining to lost profits:

> Mr. Levy: I work with Adrian Zuckerman. Adrian suggested you might be able to help us. We have a client engaged in litigation with its landlord. The landlord prevented our client from opening a café in its leased space and then wrongfully evicted the client. ***One issue in the litigation is the lost profits our client could have made had the café opened***. Our client operates several cafes in comparable locations in the city and has a track record that can be analyzed. ***We need an expert to review the client's data, and whatever other information you think relevant, and give us an opinion as to the amount of the lost profits***. If this is something you might be interested in, we'd be happy to call you to discuss it further at your convenience. If you are interested, please let me know when you are available to talk and please let me know if you would like any further information before we talk.
>
> Thank you.
>
> Ralph Berman

(Emphasis added.)

62.   Seyfarth continually misled the Debtor by failing to advise that the deadline to produce expert reports had long since passed, while instead continually providing the false impression that expert reports could still be used by the Debtor in the litigation. For example, after retaining CohnReznick, Berman contacted Debtor by email dated August 24, 2016 (with copies to Seyfarth attorneys Zuckerman and Wolfert), instructing Debtor to supply the expert with necessary financial information, without disclosing that the deadline to produce any resulting expert report was long gone.

63.   Seyfarth's and Berman's misleading correspondence with its client continued into September. Berman contacted Debtor again by subsequent emails, including by email dated September 1, 2016 (with copies to Seyfarth attorneys Zuckerman and Wolfert), again instructing

Debtor to supply the expert with necessary financial information, warning that any delay would impair the ability to finish the report "in time [*sic*]" without (yet again) disclosing that the deadline to produce the report had in fact already elapsed.

**C.      Seyfarth's Negligence Comes to Light**

64.      After Seyfarth permitted discovery to close for the second time without producing any expert reports as to liability or damages, the Landlord filed a motion for summary judgment on September 30, 2016 [Docket No. 35 in the Landlord Action], as Seyfarth anticipated it would.

65.      On November 30, 2016, Seyfarth filed a response in opposition to the motion for summary judgment on behalf of Blue Dog [Docket No. 45 in the Landlord Action]. Attached to the response in opposition, Seyfarth filed and served, for the first time, the declarations (without formal expert reports) of two expert opinion witnesses, Dean Stracuzza [Docket No. 45-3 in the Landlord Action] and Lamar Jermaine Russell [Docket No. 45-5 in the Landlord Action], both of which were dated that same day.

66.      Promptly thereafter, by letter dated December 2, 2016 [Docket No. 47 in the Landlord Action], counsel for the Landlord objected to the submission of expert declarations from two undisclosed opinion witnesses who were never previously identified as required by Fed. R. Civ. P. 26(a)(2)(A), and whose reports were due (on extension) by August 10, 2016, yet were never produced as required by Fed. R. Civ. P. 26(a)(2)(B). The Landlord objected that the "last-minute submission by the debtor of declarations by two previously undisclosed expert witnesses, without having ever (much less timely) provided the Landlord with required expert reports is patently unfair and violates this Court's deadlines for expert disclosures." For this reason, the Landlord requested a conference to consider a motion to strike, and further requested that Blue Dog "be barred from offering the Russell and Stracuzza declarations, and from presenting any other expert witness testimony whatsoever in this case."

67.     Notwithstanding the foregoing objection and motion to strike, and with full awareness that the expert deadlines had passed, Berman provided CohnReznick with a "markup" of the draft damages report by email on December 13, 2016, without disclosing that the report was untimely.

68.     The same day, Berman additionally emailed his "markup" of the CohnReznick draft damages report to Debtor, inviting comments and suggesting "We would like to have this ready so that we can tell the Court on Thursday it is done."

69.     As requested, the Court held a hearing on the motion to strike on December 15, 2016. *See* Hearing Transcript [Docket No. 52 in the Landlord Action]. After reviewing the expert disclosure requirements in the Federal Rules and the Court's own scheduling orders, and the fact that Seyfarth failed to comply with those requirements, the Court asked Berman why it should not grant the motion to strike and exclude the proffered declarations. Although Berman "apologized" three times for having "misunderstood" the Court's orders setting expert deadlines (despite the fact that Seyfarth selected those very deadlines and repeatedly emphasized those looming deadlines to its client), he was unable to articulate any colorable excuse for having neglected to identify his experts and having neglected to produce timely expert reports as required. Instead, he attempted to camouflage Defendants' neglect by reference to unrelated discovery proceedings. The Court quickly saw through this deflection:

> THE COURT: Where do you get the idea that because I allowed a little bit of other fact discovery to go forward that that automatically extended your date to even identify who your proposed experts would be?
>
> MR. BERMAN: Well, Your Honor, if we misunderstood, I do apologize, but we took it to be extended as well because it wasn't just a little bit of extra discovery. This was discovery that sort of went to the heart of the case and really had a great deal to do with –
>
> THE COURT: It didn't have anything to do with what your two experts have said.

\* \* \*

THE COURT: Just because there is factual discovery on an issue going underway has nothing to do with whether your experts could and should have been identified to talk about what the general practices in the state of New York and City of New York were. *In fact, one of your experts says that he was looking at this issue last March. So what is the possible excuse for your delay? And don't just tell me that you think that I didn't require it. I mean, you never identified that you were postponing your experts, you just -- looks to me like you just tried to hide them*.

\* \* \*

THE COURT: I never extended the time for expert discovery, and they never got to take the depositions because you never told them you were planning to use these people. So what did you think was going to happen? Did you think I was going to re-open the discovery again? I don't see how under the circumstances of this case you could think that my prior discovery rulings where I was very explicit that I was only authorizing specific items to go forward, how could you think that that gave you time to delay the revelations of who your experts were? Because that, in effect, would have taken away from them, the right to do to the discovery that explicitly was contemplated in the pretrial.

\* \* \*

THE COURT: [Quoting from the transcript of the July 19, 2016 Hearing Transcript, during which the Court found Seyfarth's position to be "utter nonsense."] What part of that statement could you possibly interpret as an extension of your time to disclose your experts?

\* \* \*

THE COURT: *How could you possibly interpret what I just read as meaning that you would make your expert disclosures after the fact witnesses? I said exactly the opposite. I described the attitude that lawyers take, as though experts can't possibly proceed until all fact discovery is finished, I described it explicitly as nonsense. And then in the next sentence as utter nonsense*. And I said very explicitly, there's no reason why you can't get your experts done within the normal discovery schedule or why they have to wait until the fact witnesses are done. You should have been working on that already so you can finish that, also, by August 10. Not that it would somehow wait until the fact discovery. It couldn't have been more explicit to you that I was not agreeing with any suggestion that the experts would just automatically be postponed until every last shred of potential fact discovery was done.

\* \* \*

THE COURT: [Responding to Berman's *tu quoque* argument that the Landlord had likewise filed untimely expert reports.] They did not present anything that they purported to be an expert. You called it an expert. You called it a legal expert. ***I am not going to let you bootstrap your characterization of their proposed witness and whether it is admissible into a flagrant violation by you of my disclosure requirements and the disclosure requirements of the rule. Far from showing an actual justification or substantial justification here, you seem to have proceeded in utter disregard of the explicit requirements of the pretrial order.*** Quite frankly, I didn't remember, and I am glad you gave me this transcript, because I didn't remember being – having been as explicit as I was during the discovery conferences about the expert requirements, but having met -- having reread it now, I'm more confident than ever that ***all you did here was try to game the system***.

And, you know, there's two things that have been going on here that I am very disturbed about. I re-opened this case because I thought that you had raised an issue that hadn't been ruled on, and I had a conference with both of you, I think 13 months ago, about whether we should try the case here, where you both thought that we could have the case ready for trial within three months, which would have been in everybody's interest because the issues were fairly straightforward.

Instead, I've had -- you both agreed on a longer discovery schedule, and I've had an inordinate number, for a case of this kind and size, of discovery conferences. At your request, I have been quite hard on the landlord for what I perceived as instances in which it wasn't conducting discovery in the way I expected in terms of the 30(b)(6) witness, who hadn't been prepped in terms of document production, in terms of whether witnesses had knowledge only to show up with having filed affidavits. And, if anything, I've bent over backwards to make sure discovery on those points were open. ***And I am going to hold you to the same standard, and, quite frankly, your failure to identify these witnesses is far more flagrant than any of the conduct you complained that the landlord has engaged in, and far from have having a justification, it is utterly unexplained***. I'm going to exclude them. I have to exclude them under Rule 37. So they will not be part of the record for summary judgment. You will not be allowed to use them at trial, if we have a trial. Okay?

Hearing Transcript [Docket No. 52 in the Landlord Action], p.5, lines 13-23; p.6 line 16; p.7, line 1; p.7, lines 5-16; p.10, lines 2-19; p.11, lines 5-21; p.12, line 7; p.13, line 23 (emphasis added).

70.     Throughout this lengthy colloquy examining his unexcused failure to make timely expert disclosures, Berman failed to inform the Court that the Debtor had actually already produced an expert report from Bendix, or that Seyfarth had also retained Gary Levy and

CohnReznick (at considerable expense) to prepare a report and offer expert testimony as to Blue Dog's damages (although he promised Debtor two days earlier that he would do precisely that: "We would like to have this ready so that we can tell the Court on Thursday it is done.").

71.    Although Seyfarth failed to disclose or identify Mr. Levy and failed to serve any report (timely or otherwise), the draft report prepared by CohnReznick opined that Blue Dog suffered lost profits in the amount of $4.5 million for the three-year period from March 1, 2015 through February 28, 2018. (This partial figure represented only a small portion of Debtor's damages, however, because it failed to reflect lost profits through the entire ten-year term of the lease ending in 2022, or the five-year option period thereafter. Likewise, the report excluded any recognition of catering revenue, which Debtor advised would be a substantial share of the total revenue of the operation.) Nonetheless, in the Joint Pretrial Order (Proposed) and Revised Joint Pretrial Order (Proposed) later filed at Docket Nos. 54 and 60 in the Landlord Action, Seyfarth recited precisely this $4.5 million damage figure, albeit without the benefit of any supporting expert report or admissible testimony.

72.    By order dated December 19, 2016 [Docket No. 51 in the Landlord Action], the Court struck the expert witness declarations filed by Seyfarth and barred Blue Dog from using those individuals as expert witnesses in connection with any motion, hearing or trial in the Landlord Action. The Court additionally scheduled the Landlord Action for trial on January 27, 2017, approximately one month later.

73.    On January 13, 2017, Seyfarth filed a Motion *in Limine* [Docket No. 53 in the Landlord Action] to preclude the Landlord from offering certain evidence at trial. On January 20, 2017, the Landlord filed its Response [Docket No. 55 in the Landlord Action], including its own request to strike witnesses who had never been identified by Seyfarth until just days earlier. *See* Landlord's Response, pp. 32-35 [Docket No. 55 in the Landlord Action]. Specifically, the

Landlord recited that on January 16, 2017, Seyfarth identified, for the first time, three new witnesses that were never before disclosed, followed by the identification of a fourth undisclosed new witness on January 17, 2017. The Landlord objected that the newly-disclosed witnesses were offered to provide expert testimony in violation of the Court's December 19, 2016 Order barring Blue Dog from calling expert witnesses at trial, a tactic the Landlord described as an "eve-of-trial … end-run around this Court's order."

74.     The Court convened a hearing on the dueling motions *in limine* on January 25, 2017. *See* Hearing Transcript [Docket No. 61 in the Landlord Action]. During the hearing, the Court determined, once again, that Seyfarth failed to provide timely expert disclosures and would therefore be barred from offering any experts at trial. In so doing, the Court rejected Berman's effort to disguise the newly-disclosed witnesses as simple fact witnesses:

> THE COURT: All right. I mean, move to the other issue you raised, that apparently there's some witnesses you never heard of before?
>
> MR. SCHMIDT: Yes, Your Honor. ***It appears to us that there seems to be sort of an end around out of the expert exclusion order that you have entered in this case***.
>
> * * *
>
> MR. SCHMIDT: Your Honor, these are not fact witnesses. ***This is really an end around an expert witness, and what he just described is actually expert witnesses***. None of these witnesses have any idea or firsthand knowledge as to what was going on in the debtor's place. ***It was simply by extrapolation, just to provide expert testimony here***.
>
> * * *
>
> THE COURT: Well, if you're offering these witnesses to show a prevailing practice in the community or a prevailing practice of the Health Department, ***how is that not expert testimony***?
>
> * * *
>
> THE COURT: Well, there's only two possibilities; one is that you're just offering it so that they can say, well, this happened to me -- which I don't really

know that that's relevance as to what the law actually required; or you want to offer it to say that they, by virtue of their experience, have sufficient experience and familiarity with this issue to be able to testify as to what the prevailing legal requirements are and how they were applied by the Health Department and the fire department, which –

MR. BERMAN: I'm sorry, Your Honor, I didn't catch that.

THE COURT: The other alternative is that you're offering them to say that by -- that they have sufficient experience to enable them to testify as to how, on a prevailing basis, the Health Department or fire department viewed these issues and what the actual requirements and experience were and ***that, by its definition, is expert testimony***.

\* \* \*

THE COURT: Yeah, no, it seems to me that as I say, there's only two possibilities. Either that's just hey, this is what happened in my case, in which case I don't know that that really proves anything, or ***it's just expert testimony that you're unwilling to call expert testimony, and I'm not going to allow it. And if that leaves you with a difficulty of proof, that's your own fault, for not designating experts when you should have***.

Hearing Transcript [Docket No. 61 in the Landlord Action], p.15, lines 2-7; p.16, lines 8-14, 20-23; p.17, lines 6-24; p.18, lines 10-17 (emphasis added).

75.     Prior to trial on January 27, 2017, the Court directed the parties to return to mediation, which occurred on February 8 and 10, 2017.

76.     The Landlord stated at the outset of the mediation that there would be "no money on the table," and it offered only to allow Debtor, at some undetermined future date, to resume possession of the leasehold premises, with no payment of damages. Recognizing the impaired state of their case, in which they could not present expert testimony, and in an effort to avoid the exposure of their own negligence, Defendants encouraged Debtor to accept this vague and scrawny zero-dollar offer.

77.     In the meantime, by email dated February 1, 2017, Berman transmitted a copy of the now-inadmissible CohnReznick report to Debtor. Without confessing that the report was

inadmissible because of Defendants' missed deadlines, Berman attempted to recruit Debtor's principal, Elizabeth Slavutsky, to substitute for CohnReznick as a damages witness, suggesting "We should also discuss further preparation for trial in case the settlement is not successful. In the first instance, if you could make a chart, just like the one you made for lost profits, showing the actual numbers and actual profits for the same time period for the location you based your estimates on."

78.    Seeking to assuage her concerns regarding the order barring Debtor from calling expert witnesses, Berman explained to Slavutsky that she would be her own "best expert" because she knew the details of Debtor's business operations and anticipated profits. At Berman's instruction, therefore, Slavutsky prepared a lost profits analysis that Seyfarth intended to present at trial to establish Debtor's damages claim, which she determined to be $1,708,300 for 2015, $3,749,750 for 2016, and $3,897,800 for 2017.

79.    Unlike the CohnReznick report, which ignored lost revenue associated with catering operations because it lacked the expertise to opine as to catering, Slavutsky included such revenues, which were expected to generate a substantial portion of Debtor's overall revenue.

80.    On February 3, 2017, the parties filed a Revised Joint Pretrial Order (Proposed) [Docket No. 60 in the Landlord Action] in which, as indicated above, Seyfarth reiterated Blue Dog's $4.5 million partial damage claim taken from the undisclosed, untimely CohnReznick report (although well below the full measure of damages as demonstrated by Slavutsky).

81.    No settlement was achieved at mediation, and the docket remained quiet for the next two months until April 14, 2017, when Seyfarth filed a Motion for Leave to Withdraw [Docket No. 62 in the Landlord Action; Docket No. 79 in the Debtor's lead case], seeking Court permission to abandon its client outright.

82.    By its Motion for Leave to Withdraw, Seyfarth asked the Court to allow it not only to withdraw as counsel, but also to assert a retaining lien against Blue Dog's litigation files and to

assert a charging lien against any recovery (monetary or otherwise) that Blue Dog might realize in
the continuing litigation, despite the fact that the firm's engagement letter [Docket No. 60-2 in the
Debtor's lead case] and retention application [Docket No. 60 in the Debtor's lead case] both
expressly provided that Blue Dog would not be responsible for the payment of any fees.

83.     Blue Dog - now represented by new counsel - responded by filing an Application
asking the Court to Deny, in Part, the Motion for Leave to Withdraw [Docket No. 63 in the
Landlord Action; Docket No. 81 in the Debtor's lead case]. In its Application, Blue Dog recounted
that Seyfarth missed critical deadlines in the Landlord Action, impacting not only the prosecution
of the case but also the lawyer-client relationship. For this reason, Blue Dog agreed that it was
critical for it to change counsel in an effort to salvage the case. Conversely, Blue Dog opposed the
Motion for Leave to Withdraw to the extent it sought to recover "further exorbitant and
unreasonable compensation," to impose any liens, or otherwise to blockade Blue Dog's efforts to
prepare the case for trial.

84.     Echoing Blue Dog's objections, the United States Trustee filed a separate Objection
to Aspects of the Motion of Seyfarth Shaw, LLP to Withdraw as Counsel [Docket No. 88 in the
Debtor's lead case], in which the Trustee opposed the firm's request to enforce an alleged lien,
which would not only be "inappropriate," but also was never disclosed in the retention application,
and objected to any request to seek fees from the estate, contrary to the terms of the retention
order.

85.     Seyfarth also attempted to renegotiate the terms of its representation - *after the
representation had ended* - by simultaneously filing an Application for Entry of an Order to Amend the
Order Authorizing its Employment and Compensation [Docket No. 70 in the Landlord Action;
Docket No. 99 in the Debtor's lead case] and a Rule 9019 Motion to Approve the Settlement
Agreement [*sic*] Resolving the Motion for Leave to Withdraw and Objections Thereto [Docket

No. 71 in the Landlord Action; Docket No. 99 in the Debtor's lead case]. In this dual filing, Seyfarth argued, *inter alia*, that Blue Dog and the United States Trustee agreed to amend the retention order to obligate Blue Dog to compensate the firm for its legal fees as an administrative expense and that it could continue to withhold the litigation files until seven days after orders approving the settlement and amending the retention order became final. Not surprisingly, no other party agreed with Seyfarth's account.

86.      The Court convened a hearing on the Seyfarth motions on June 23, 2017. *See* Hearing Transcript [Docket No. 78 in the Landlord Action]. Put briefly, the Court summarily rejected Seyfarth's claim that there was a final binding "settlement" of its fee request, rejected its after-the-fact request to modify the terms of its engagement, rejected the request to receive payment from Blue Dog, and rejected the argument that Seyfarth had any right to retain the files or otherwise assert a retaining lien or a charging lien. The Court formally docketed its ruling as a Bench Decision dated July 21, 2017 [Docket No. 77 in the Landlord Action].

87.      By Order dated July 5, 2017 [Docket No. 76 in the Landlord Action; Docket No. 109 in the Debtor's lead case], the Court (i) authorized Seyfarth to withdraw as counsel, on the condition that it surrender all associated litigation files within five days; (ii) ordered that the withdrawal would not be effective unless and until the files were completely turned over; (iii) ordered that the Court would retain jurisdiction over Seyfarth with regard to, *inter alia*, any and all disputes relating to Seyfarth's retention by the Debtor; and (iv) ordered that the Motion for Leave to Withdraw, the Motion to Approve Settlement and the Motion to Amend the retention order were otherwise *denied* in all respects.

### D.    **Debtor's Damages**

88.    Defendants' negligence substantially hindered, delayed and impaired the prosecution and potential for resolution of the Landlord Action, in which the Debtor was forced to proceed without the benefit of expert witnesses as to liability or damages.

89.    As a direct and proximate result of Defendants' negligence, Debtor was impaired in the negotiation of a settlement with the Landlord, which naturally took comfort in the orders barring Debtor from presenting experts as to liability or damages.

90.    Consistent with Debtor's inability to present liability or damages experts as a result of Defendants' negligence, the Landlord refused during Defendants' tenure as counsel to pay any damages. As set forth above, the only offer Landlord would make was to allow Debtor to resume possession at some undetermined future date, but with no settlement payment for its damages.

91.    In contrast, and despite Defendants' negligence, Debtor's new counsel were able to negotiate a settlement in the Landlord Action providing, *inter alia*, for the payment to Debtor of $300,000 (well beyond the $0.00 that Seyfarth negotiated and encouraged Debtor to accept in settlement of its claims), together with the assumption of Debtor's lease and waiver of the Landlord's administrative claim for cure payments, thus validating that the lease was in full force and effect as of the petition date.

92.    As a direct and proximate result of Seyfarth's negligence, the Debtor has suffered lost profits through lease-end (including the option period) of not less than $52,231,650.

93.    In addition, as Defendants themselves requested in the underlying Landlord Action, Debtor was entitled to recover from its Landlord treble damages under Section 853 of the New York Real Property Actions and Proceedings Law. (*See* Complaint [Docket No. 1 in the Landlord Action] at Count II, *passim*, ¶¶ 5and 58, and *ad damnum* (b))("Landlord is further liable to Blue Dog for wrongful eviction in an amount to be determined at trial, together with interest and treble

damages thereon.") Accordingly, Debtor's total monetary damages resulting directly and proximately from Defendants' negligence are not less than $156,694,950.

94.     As a further direct and proximate result of Seyfarth's negligence and resulting delays, Debtor has incurred additional quarterly United States Trustee fees that would have been avoided through an earlier resolution of the Landlord Action and corresponding completion of the Bankruptcy Case.

**E.      Seyfarth Repeatedly Attested to and Advocated the Validity of the Landlord Action Subject to the Requirements of Rule 11**

95.     Throughout its involvement in the Landlord Action, both behind-the-scenes and later in the full view of the Court, Seyfarth repeatedly attested that Blue Dog's case was meritorious and well-founded in both fact and law.

96.     By way of example, and without limitation, in its Retention Application [Docket No. 60 in the Landlord Action], Seyfarth represented to the Court, subject to the requirements of Fed. R. Civ. P. 11 and Bankr. R. 9011, that Blue Dog entered into a ten-year lease agreement dated January 1, 2012, that it spent over two years and over $1.6 million carrying out the renovations and build-out at the premises necessary to open and operate a café, that it spent more than $500,000 paying rent, that the Landlord wrongfully evicted and dispossessed Blue Dog of the premises, that Seyfarth has considerable experience and knowledge in the field of commercial landlord-tenant disputes and related litigation and is well qualified to represent Blue Dog in the litigation, that it had been involved in the underlying transactions since before the bankruptcy filing, and that the employment of Seyfarth to prosecute the Landlord Action would be in the best interests of Blue Dog and the estate.

97.     After its approval as special counsel, Seyfarth continued to endorse the validity of the Landlord Action, both implicitly and explicitly, by its continued representation. By way of

further example, without limitation, in its Opposition to the Defendant's Motion for Summary Judgment [Docket No 45 in the Landlord Action], Seyfarth represented to this Court, subject to the requirements of Fed. R. Civ. P. 11 and Bankr. R. 9011, that Blue Dog had resolved all old disputes with the Landlord, that the Lease had been reinstated, that it was current on its rent, that it was ready, willing and able to open for business, that it had satisfied all required regulatory prerequisites and was legally entitled to open, and that the Landlord wrongfully obstructed it from opening.

98.    By way of further example, without limitation, in the Joint Pretrial Order (Proposed) [Docket No. 54 in the Landlord Action] and Revised Joint Pretrial Order (Proposed) [Docket No. 60 in the Landlord Action], Seyfarth represented to this Court, subject to the requirements of Fed. R. Civ. P. 11 and Bankr. R. 9011, that Blue Dog suffered monetary damages in the (understated) amount of at least $4.5 million as the result of the Landlord's unlawful conduct.

99.    By way of further example, and without limitation, in its Rule 9019 Motion to Approve the Settlement Agreement [Docket No. 71 in the Landlord Action; Docket No. 99 in the Debtor's lead case], Seyfarth represented to this Court, subject to the requirements of Fed. R. Civ. P. 11 and Bankr. R. 9011, that its legal services in prosecuting the Landlord Action conferred a benefit upon Blue Dog and the estate, *see* 11 U.S.C. § 330(a)(3), that "Seyfarth provided service of substantial value to the Debtor's estate," and that payment by Blue Dog for those services would be in the best interests of the estate.

100.    In short, Seyfarth repeatedly endorsed every element of the claims against the Landlord in the Landlord Action, including lease validity, liability, damages and treble damages calculated thereon.

## FIRST CLAIM FOR RELIEF
### (Negligence/Legal Malpractice)

101.    Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if fully set forth herein.

102.    Defendants had a duty to use ordinary care in prosecuting the Landlord Action, and were specifically required to take all steps necessary to preserve and advance the prosecution of Blue Dog's claims and causes of action.

103.    More specifically, and without limitation, Defendants were required to comply with all scheduling orders and other deadlines issued by the Court so as not to waive or impair Blue Dog's claims and causes of action.

104.    Defendants breached their duties by, *inter alia*, failing to take all required steps necessary to preserve and advance the prosecution of Blue Dog's claims and causes of action and by failing to comply with all scheduling orders and other deadlines issued by the Court so as not to waive or impair Blue Dog's claims and causes of action.

105.    Defendants' negligent failure to comply with the Court's deadlines governing expert reports (which Defendants admitted was "a fairly important part of the case") is not within the purview of "litigation strategy," and, as this Court has already found, was not justified or excusable. As such, this failure constitutes actual and material negligence.

106.    As a direct and proximate result of Defendants' negligence, Debtor has sustained damages in an amount of not less than $156,694,950.

WHEREFORE, Blue Dog respectfully requests entry of judgment in its favor and against Defendants, jointly and severally, as follows:

(i)    Awarding Blue Dog damages in an amount to be determined at determined at trial and not less than $156,694,950, plus interest;

(ii)    Awarding Blue Dog all fees and costs, including attorneys' fees, associated with this action; and

    (iii)    Granting Blue Dog such other and further relief, both at law and in equity, as the Court may deem just and proper.

Dated: February 26, 2019

LAW OFFICE OF SCOTT M. HARE

By:    <u>/s/ Scott M. Hare</u>
Scott M. Hare
1806 Frick Building
437 Grant Street
Pittsburgh, PA 15219
(412) 338-8632
scott@scottlawpgh.com
Pa. I.D. No. 63818
Michigan P52081

Special Counsel to Blue Dog at 399 Inc.